James R. WIGGINS, Jr., Plaintiff,

v.

PHILIP MORRIS, INC.,

and

Kenneth Nedimyer, Defendants.

Civ. A. No. 92–0493 (RCL).

United States District Court,
District of Columbia.

May 13, 1994.

John C. LaPrade, Washington, DC, Frazier Walton, Jr., Alexandria, VA, for plaintiff.

Hadrian R. Katz, Erica Frohman Plave, Arnold & Porter, Washington, DC, for defendants.

### MEMORANDUM OPINION

LAMBERTH, District Judge.

■ This case comes before the court on defendant Philip Morris, Inc.'s motion to dismiss the retaliatory discharge claim in count one, and to dismiss counts two, three, and four of the complaint for failure to state a claim upon which relief can be granted. Fed. R.Civ.P. 12(b)(6).[1] Upon consideration of the filings of counsel and the relevant law, defendant Philip Morris, Inc.'s motion to dismiss is GRANTED in part and DENIED in part in accordance with this memorandum opinion.[2]

### I. Introduction

Defendant characterizes plaintiff's complaint as "vague, confusing, contradictory, and inconsistent." Def.'s Mem.Supp.Mot. Dismiss at 4. Defendant is correct. In essence, plaintiff is searching for a legal basis for a wrongful discharge claim. In his complaint, plaintiff seeks to recover damages for civil rights violations, violations of the Maryland Labor and Employment Code and the Fair Credit Reporting Act, and pendent state-law claims.[3]

### II. Retaliatory Discharge

■ In order to establish a prima facie case of retaliatory discharge under section 704(a) of Title VII, 42 U.S.C. § 2000e-3,[4] "a

---

1. Plaintiff's factual allegations must be presumed true and liberally construed in favor of the plaintiff when reviewing the adequacy of a complaint for purposes of a Rule 12(b)(6) motion. *Phillips v. Bureau of Prisons*, 591 F.2d 966, 968 (D.C.Cir. 1979) (citing *Miree v. Dekalb County, Georgia*, 433 U.S. 25, 27 n. 2, 97 S.Ct. 2490, 2492–93 n. 2, 53 L.Ed.2d 557 (1977)). In addition, the plaintiff must be given every favorable inference that may be drawn from his allegations of fact. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). "However, legal conclusions, deductions or opinions couched as factual allegations are not given a presumption of truthfulness." 2A *Moore's Federal Practice*, § 12.07, at 63 (2d ed. 1986) (footnote omitted); *see Haynesworth v. Miller*, 820 F.2d 1245, 1254 (D.C.Cir.1987) (citing *Pauling v. McElroy*, 278 F.2d 252, 254 (D.C.Cir.), *cert. denied*, 364 U.S. 835, 81 S.Ct. 61, 5 L.Ed.2d 60 (1960)). Dismissal is only appropriate if it appears beyond doubt that no set of facts proffered in support of plaintiff's claim would entitle him to relief. *Haynesworth*, 820 F.2d at 1254 (citations omitted); *Phillips*, 591 F.2d at 968.

2. Defendant agrees that "plaintiff has asserted a legally adequate Title VII claim for discrimination," Mem.Supp.Def.'s Mot.Dismiss at 3; however, defendant "vigorously denies any racial discrimination or bias of any sort in connection with plaintiff's employment or termination" and maintains that plaintiff's discriminatory discharge claim is "factually a complete fabrication." *Id.* The only other claim contained in count one is the retaliatory discharge claim.

3. As previously stated, count one alleges violations of Title VII. However, plaintiff's complaint is so poorly pled that his § 1981 count also contains minimal allegations of conspiracy to deprive plaintiff of his employment, two counts of tortious interference with plaintiff's employment, defamation, wire fraud, mail fraud, violations of 42 U.S.C. § 1985(3), the D.C.Code, the Fair Credit Reporting Act, "and other federal laws." In count three, plaintiff asserts a Maryland Labor and Employment Code violation. Plaintiff seeks relief for defendants' alleged violations of the Fair Credit Reporting Act in count four.

4. Section 2000e-3(a) states in pertinent part:

It shall be an unlawful employment practice for an employer to discriminate against any of his employees for employment ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assist-

plaintiff must show: 1) that he or she engaged in activity protected by the statute; 2) that the employer ... engaged in conduct having an adverse impact on the plaintiff; and 3) that the adverse action was causally related to the plaintiff's exercise of protected rights." *Berger v. Iron Workers Reinforced Rodmen Local 201*, 843 F.2d 1395, 1423 (D.C.Cir.1988) *(citing Mitchell v. Baldrige*, 759 F.2d 80, 86 (D.C.Cir.1985); *McKenna v. Weinberger*, 729 F.2d 783, 788, 790 (D.C.Cir. 1984)), *rehearing en banc* 852 F.2d 619 (D.C.Cir.1988), *cert. denied sub nom. International Ass'n of Bridge Structural & Ornamental Ironworkers, AFL–CIO v. Berger*, 490 U.S. 1105, 109 S.Ct. 3155, 104 L.Ed.2d 1018 (1989).

■ Title VII protects employees from retaliatory action for involvement in two types of activities. The "opposition" clause of section 704(a) of Title VII prohibits discrimination against a person "because he has opposed any practice made an unlawful employment practice by this subchapter." *See supra* note 4. This clause prohibits adverse action against an individual who has opposed a practice constituting a violation of Title VII.[5]

Plaintiff engaged in numerous activities protected by the statute, making his opposi-

tion to various Philip Morris employment practices well-known.[6] Plaintiff was fired. The issue is whether these two prongs of the retaliatory action test are "causally related."

In count one, plaintiff states that "[t]here was retaliatory action and illegal termination because of plaintiff's numerous reports and notices to Philip Morris' New York City headquarters, between January 1988 through February 9, 1990." Compl. ¶ 66.

■ At this stage of the litigation, plaintiff is entitled to the favorable inference that his objections to Philip Morris' employment practices are not wholly unrelated to his termination.[7] Defendant's motion to dismiss as to count one is denied.

## III. Inapplicability of 42 U.S.C. § 1981

■ Plaintiff claims that he was harassed because of his race during the course of his employment and that this racial animus caused him to be fired. Neither of these claims are cognizable under 42 U.S.C. § 1981.

Plaintiff's allegations were not viable under section 1981 prior to the enactment of the Civil Rights Act of 1991. As the Supreme Court stated in *Patterson v. McLean Credit*

---

ed, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.
42 U.S.C. § 2000e–3(a) (1981).

5. This opposed practice need not constitute an actual violation of Title VII; the employee must only have a reasonable and good faith belief that the opposed practice constitutes a violation of Title VII.

6. Plaintiff's complaint references numerous contacts with Philip Morris management during which plaintiff presented his concerns about alleged discriminatory employment practices. *See* Compl. ¶¶ 17–19, 20–25.

For example, plaintiff "requested that Philip Morris furnish an explanation of racial comments made to [him] by Philip Morris [s]upervisors...." *Id.* ¶ 18. He requested "a grievance type meeting with management in order to discuss the reasons for: Phillip Morris' [sic] harassment, its refusal to train [p]laintiff, and the reasons underlying his immediate supervisor Hitchen's refusal to permit [p]laintiff to work with him (as is the case with that supervisor's white employees)." *Id.* ¶ 19.

Plaintiff also called a Philip Morris employees' hotline to complain about the alleged racial discrimination. *Id.* ¶ 21. He declares that he met with Philip Morris supervisors Sharon Robinson and Greg Lahew "and told them about race-related harassment, denial of training and proper merit increases...." *Id.* ¶ 23. Plaintiff also telephoned the supervisor at the affirmative action desk to advise her of his complaints. *Id.* ¶ 24. In response to his complaints, Philip Morris officials suggested that plaintiff request a transfer. *Id.* ¶ 25. Plaintiff then requested a transfer. All of these activities sufficiently articulated Mr. Wiggins' opposition to racial discrimination at the work site.

7. "The causal connection component of the prima facie case may be established by showing that the employer had knowledge of the employee's protected activity, and that the adverse personnel action took place shortly after that activity." *Mitchell v. Baldrige*, 759 F.2d 80, 86 (D.C.Cir. 1985). Plaintiff states that he complained for nearly two years about racial discrimination at Philip Morris. On the heels of asking to be transferred in order to avoid further invidious treatment from one of his supervisors, plaintiff

*Union,* section 1981 "does not apply to conduct which occurs after the formation of a contract and which does not interfere with the right to enforce established contract obligations." *Patterson v. McLean Credit Union,* 491 U.S. 164, 171, 109 S.Ct. 2363, 2369, 105 L.Ed.2d 132 (1989).

▮ Section 1981 does not protect an employee against discriminatory treatment during the course of his employment, including the imposition of discriminatory working conditions. *See Patterson,* 491 U.S. at 177, 109 S.Ct. at 2372–73; *Gersman v. Group Health Ass'n,* 931 F.2d 1565, 1570–72 (D.C.Cir.1991), *vacated and remanded —— U.S. ——,* 112 S.Ct. 960, 117 L.Ed.2d 127 (1992). Furthermore, section 1981 does not apply to breach-of-contract or contract-termination claims. *See Gersman,* 931 F.2d at 1571. Plaintiff's racial harassment and discriminatory discharge claims under section 1981 are dismissed.[8]

▮ To the extent that Mr. Wiggins argues that the Civil Rights Act of 1991 should apply retroactively to his case, the claim is denied. *Rivers v. Roadway Express, Inc., —— U.S. ——, —— - ——,* 114 S.Ct. 1510, 1513, 128 L.Ed.2d 274, 1994 U.S. Lexis 3294, *5–6 (April 26, 1994); *Gersman v. Group Health Ass'n,* 975 F.2d 886, 889–900 (D.C.Cir.1992) (adopting the decision in *Gersman v. Group Health Ass'n,* 931 F.2d 1565 (D.C.Cir.1991), *vacated and remanded —— U.S. ——,* 112 S.Ct. 960, 117 L.Ed.2d 127 (1992)), *cert. denied —— U.S. ——,* 114 S.Ct. 1642, 128 L.Ed.2d 363 (1994); *Van Meter v. Barr,* 778 F.Supp. 83 (D.D.C.1991); *Allen v. McEntee,* 1993 WL 121513, 1993 U.S. Dist. LEXIS 4122 (D.D.C. Apr. 2, 1993) (Lamberth, J.).[9]

### IV. Maryland Labor and Employment Code

▮ Plaintiff was placed on temporary disability status after he was seriously injured while working on the job for Philip Morris in July 1988. Compl. ¶ 80–81. In count three of his complaint, plaintiff asserts:

In violation of the Maryland Code, Title 9–1105 Maryland Employment and Labor [sic], Phillip Morris [sic] terminated Plantiff [sic] in March of 1990 with knowledge that Plaintiff had been on temporary partial disability resulting from injuries sustained in 1988 and 1989.

*Id.* ¶ 83.

Plaintiff maintains that Philip Morris wrongfully terminated him in violation of the Maryland statute prohibiting the discharge of an employee who files a claim for workers' compensation. The Maryland Labor and Employment Code ("the Code") provides that "[a]n employer may not discharge a covered employee from employment *solely* because the covered employee files a claim for compensation under this title." MD. LAB. & EMPL. CODE ANN. § 9–1105 (1991) (emphasis added).

In his complaint, plaintiff does not allege that he timely filed a claim for worker's compensation.[10] Code § 9–709 expressly states:

Unless excused by the Commission under paragraph (2) of this subsection, failure to file a claim in accordance with subsection (a) of this section *bars a claim under this Title.*

*Id.* § 9–709(b). Subsection (a) requires a covered employee to report any accidental personal injury to the State Workers' Com-

---

was terminated. This court finds that plaintiff's allegations meet this burden.

8. An employer's refusal to offer an employee training is not conduct involving the refusal to make a contract or the impairment of the enforcement of an established contractual right. *See Patterson,* 491 U.S. at 178–79, 109 S.Ct. at 2373; *see also Wiggins v. Philip Morris, Inc.,* 853 F.Supp. 458, § II(B) (D.D.C.1994) (denying plaintiff's § 1981 claim that defendant Nedimyer obstructed his "right" to participate in the internal Philip Morris grievance process).

9. To the extent that plaintiff contends that the Act was intended to apply to pre-Act conduct, his claim is denied. *See Wiggins v. Philip Morris, Inc.,* 853 F.Supp. 458, § II(B) (D.D.C.1994) (denying and granting in part defendant Nedimyer's motion to dismiss).

10. The complaint states:
On July 21, 1988 Plaintiff was hurt installing a heavy display case in the District of Columbia. Philip Morris was notified and filed worker's compensation claims in its office in the District of Columbia.
Compl. ¶ 43.

mission Committee within 60 days after the date of the accident. *Id.* § 9–709(a).

In his complaint, plaintiff merely declares that he "reported [his] injury to the Baltimore, Maryland offices of the Worker's Compensation Board and to the Hartford Insurance Company, Worker's Compensation Board's insurance carrier." *Id.* ¶ 82. In his opposition to the motion to dismiss, plaintiff states:

> Plaintiff states a valid *prima facie* case against Phillip Morris [sic] for violation of Maryland Labor and Employment Code § 9–1105. The required filing of the claim was made in a timely fashion by Phillip Morris [sic] or its carrier, on Plaintiff's behalf in accordance with Maryland State law, and Plaintiff's subsequent discharge was a direct result of such filing of the workers compensation claim.

Plf.'s Opp'n Def.'s Mot. Dismiss at 2.[11]

However, even if Mr. Wiggins did timely file a workers' compensation claim, he cannot claim that he was fired *solely* because of any such claim. *Kern v. South Baltimore Gen. Hosp.,* 66 Md.App. 441, 504 A.2d 1154, 1159 (1986) ("To sustain a wrongful discharge action under Maryland's workers' compensation statute, an employee must allege that he or she was discharged solely and directly because of filing for benefits under § 39A. . . ."); *see Childers v. Chesapeake & Potomac Tel. Co.,* 881 F.2d 1259, 1264 (4th Cir.1989) ("[A] wrongful discharge action lies when an employee is discharged "solely" be-

cause he has filed for workers' compensation benefits.").[12] Indeed, Mr. Wiggins expressly states in his complaint that he was fired for racially motivated reasons.[13]

Therefore, count three of plaintiff's complaint is dismissed.

## V. The Fair Credit Reporting Act

Count four alleges that defendant unlawfully obtained a false consumer report from Equifax, Inc. and used this report for impermissible purposes in violation of the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq.* (hereinafter "the Act" or "the FCRA"). Compl. ¶¶ 47–50, 84–97. None of plaintiff's specific allegations state a cause of action against Philip Morris under the Act.

First, plaintiff alleges that defendant requested an "unauthorized" consumer report on January 16, 1990 pursuant to 15 U.S.C. § 1681(a), "without written instruction required by 15 U.S.C. § 1681(b) [sic] and in violation of other provisions of the FCRA." Compl. ¶ 87. Taking all of plaintiff's allegations as true,[14] plaintiff fails to state a cause of action under sections 1681(a), 1681a, 1681b, or any other provision of the Act.

■ Neither section 1681(a) nor section 1681a contain provisions that create liability under the FCRA.[15] In addition, Philip Morris, as an alleged "user" of consumer information,[16] is incapable of violating section 1681b of the Act.[17] Section 1681b does not

---

**11.** Of course, this allegation is contradicted by statements made by plaintiff in his complaint:

> Plaintiff was awarded six months disability with pay; however, Philip Morris failed to make any required Worker's Compensation claim to any agency in the District of Columbia or Maryland.

Compl. ¶ 46.

**12.** Section 39A of the Maryland Labor and Employment Code was recodified as section 9–1105 in 1991.

**13.** On the *facts* as pled in his complaint, plaintiff's § 9–1105 claim must be dismissed because plaintiff maintains that race was a factor in his termination from employment. Plaintiff may choose to amend his complaint and state that race played no part in his discharge; however, if plaintiff so chooses, this court will reevaluate its position on other claims in this case.

**14.** Defendant vigorously denies ever requesting or receiving a consumer report concerning plaintiff from Equifax. Def.Mot.Dismiss at 11. Defendant also notes that Equifax has denied ever having received or responded to a request from defendant for an Equifax report during 1990. *Id.* n. 11.

**15.** Section 1681(a) outlines the congressional findings of fact underlying the creation of the Act. Section 1681a sets forth the definitions and rules of construction applicable under the FCRA.

**16.** Philip Morris is a "user" and not a consumer reporting agency as defined by the Act, 15 U.S.C.A. § 1681a(f) (1988).

**17.** Consumer reporting agencies are restricted from willy-nilly production of consumer reports. Section 1681b states:

impose a duty upon a user to obtain written permission from a consumer prior to requesting a report from a consumer reporting agency.[18]

Next, defendant allegedly made false and fraudulent representations to Equifax, Inc. in order to procure a consumer report in violation of section 1681b. Compl. ¶ 88–90, 96. The Act does create liability for users who obtain a credit report under false pretenses for an impermissible purpose. *See* 15 U.S.C.A. § 1681q. "Whether a consumer report has been obtained under false pretenses will ordinarily be determined by reference to the permissible purposes for which consumer reports may be obtained, as enumerated in § 1681b." *Zamora v. Valley Fed. Sav. & Loan Ass'n,* 811 F.2d 1368, 1370 (10th Cir. 1987) (citing *Hansen v. Morgan,* 582 F.2d 1214, 1219 (9th Cir.1978); *Boothe v. TRW Credit Data,* 557 F.Supp. 66, 71 (S.D.N.Y. 1982)).

 In this case, plaintiff insists that defendant fraudulently acquired a consumer report under the guise of requiring the report for "employment purposes," when in actuality Philip Morris solicited the report in order to terminate Mr. Wiggins. Compl. ¶ 89–90. However, "[t]he term 'employment purposes' when used in connection with a consumer report means a report used for the purpose of evaluating a consumer for employment, promotion, reassignment or *retention as an employee.*" 15 U.S.C.A. § 1681a(h) (emphasis added). Under the Act, Philip Morris is entitled to obtain a consumer report relating

to its employee for the purpose of determining whether to discharge him.

 Third, plaintiff asserts that defendant "had a duty to furnish any and all consumer reports to him prior to his suspension from his employment on February 9, 1990." Compl. ¶ 95. Under section 1681m(a), "[w]henever ... employment involving a consumer is denied ... either wholly or partly because of information contained in a consumer report from a consumer reporting agency, the user ... shall so advise the consumer against whom such adverse action has been taken and supply the name and address of the consumer reporting agency making the report." 15 U.S.C.A. § 1681m(a). However, section 1681m(a) does not require a user to "furnish" a copy of the report to the consumer.[19]

 Finally, plaintiff claims that defendant violated "§ M" of the FCRA "by requesting and obtaining a report pertaining to Plaintiff at a time when Plaintiff was *not* employed at Philip Morris." Compl. ¶¶ 97, 87. Section 1681m does not prohibit a user from requesting or obtaining a report concerning an individual who is not an employee.

Defendant's motion to dismiss with respect to count four is granted.

## VI. Other Claims in Count Two

Within the text of his section 1981 claim, plaintiff makes vague allegations of two counts of tortious interference with plaintiff's employment, defamation, and violations of

---

A consumer reporting agency may furnish a consumer report under the following circumstances and no other:
(1) In response to the order of a court having jurisdiction to issue such an order, or a subpoena issued in connection with proceedings before a Federal grand jury.
(2) In accordance with the written instructions of the consumer to whom it relates.
(3) To a person which it has reason to believe—
 (B) intends to use the information for employment purposes.
15 U.S.C.A. § 1681b (West 1988 & Supp.1994).

**18.** As to plaintiff's assertion that defendant violated "other provisions" of the FCRA, Compl. ¶ 87, no other section of the Act requires a user

to seek the permission of a consumer prior to obtaining a consumer report.

**19.** In his opposition to defendant's motion to dismiss, plaintiff asserts that "Philip Morris failed to advise Plaintiff pursuant to FCRA, 15 USC § 1681m (a) after it had fired Plaintiff based upon an oral or written consumer report." Plf.'s Opp'n Mot. Dismiss at ¶ 6(a). Plaintiff also argues for the first time that Philip Morris "failed to maintain reasonable procedures pursuant to 15 USC § 1681m (b) to assure compliance with the provisions of FCRA § 1681m(a)." Without regard to the merit of these allegations, plaintiff's complaint does not assert either of these alleged violations, and plaintiff has not sought leave to amend in this case. These allegations will not be considered.

the Fair Credit Reporting Act,[20] the federal wire and mail fraud statutes, 18 U.S.C. §§ 1341, 1343, the D.C.Code, conspiracy under 42 U.S.C. § 1985(3), and civil conspiracy.

### A. Tortious Interference with Contract

Plaintiff alleges that the defendants "interfere[d] by unlawful means with [p]laintiff's employment." Compl. ¶ 73. Plaintiff states that he "was employed by and had an employment contract with Phillip Morris [sic]." *Id.* ¶ 72.

■ "Tortious interference with contractual relations arises when a defendant interferes with a contract between the plaintiff and some third party." *Weaver v. Gross*, 605 F.Supp. 210, 216 (D.D.C.1985) (citing *Donohoe v. Watt*, 546 F.Supp. 753, 757 (D.D.C. 1982), *aff'd* 713 F.2d 864 (D.C.Cir.1983)). However, Philip Morris is a party to the current contract and may not be considered a third party for the purposes of Mr. Wiggins' claims. *See Sorrells v. Garfinckel's, Brooks Brother, Miller & Rhoads, Inc.*, 565 A.2d 285, 289–290 (D.C.1989).

To the extent that plaintiff attempted to plead tortious interference with his employment with District Cablevision, defendant's motion to dismiss is denied. .Plaintiff alleges "that through Bruce Williams, Pettinelli and Hitchens, both his employers conspired and worked together to terminate [p]laintiff from both jobs ... with the aid and assistance of Equifax Services, Inc." Compl. ¶ 49. The facts alleged in furtherance of this conspiracy are numerous.

### B. Defamation

In count two, Mr. Wiggins asserts that "defendants and each of them" "defame[d] plaintiff" as they engaged in a conspiracy to unlawfully terminate the plaintiff by marking down plaintiff's performance ratings and by disseminating false, criminal record information contained in an Equifax credit report.[21] Compl. ¶ 73(2).

■ In a common-law defamation case, the court must determine "whether the challenged statement is 'capable of bearing a particular meaning' and whether 'that meaning is defamatory.'" *Fleming v. AT & T Info. Servs.*, 878 F.2d 1472, 1475 (D.C.Cir. 1989) (quoting *Tavoulareas v. Piro*, 817 F.2d 762, 779 (D.C.Cir.) (en banc), *cert. denied sub nom. Tavoulareas v. Washington Post Co.*, 484 U.S. 870, 108 S.Ct. 200, 98 L.Ed.2d 151 (1987)); *Moss v. Stockard*, 580 A.2d 1011, 1023 (D.C.1990) (citations omitted). This statement "must be more than unpleasant or offensive; the language must make the plaintiff appear 'odious, infamous, or ridiculous.'" *Howard University v. Best*, 484 A.2d 958, 989 (D.C.1984) (quoting *Johnson v. Johnson Publishing Co.*, 271 A.2d 696, 697 (D.C.1970)). A statement is defamatory "if it tends to injure the plaintiff in his trade, profession or community standing, or lower him in the estimation of the community." *Moss*, 580 A.2d at 1023. The plaintiff must prove the defamatory nature of the publication; however, "to accuse one of a crime is libel per se." *Weaver v. Grafio*, 595 A.2d 983, 988 (D.C.1991) (citing *Johnson*, 271 A.2d at 698).

■ All averments of defamation must be plead with particularity. *See Hoffman v. Hill and Knowlton, Inc.*, 777 F.Supp. 1003, 1005 (D.D.C.1991) (quoting *Asay v. Hallmark Cards, Inc.*, 594 F.2d 692, 699 (8th Cir.1979)) ("[T]he use of *in hac verba* pleadings on defamation charges is favored in the federal courts because generally knowledge of the exact language used is necessary to form responsive pleadings."); 5 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1309 (1990) ("In libel and slander suits, the time and place of the publication should be specifically stated in the complaint."). Conclusory allegations are insufficient to state a claim. *See Hoffman*, 777 F.Supp. at 1005; *Ridgewells Caterers v. Nelson*, 688 F.Supp. 760, 763 (D.D.C.1988). A plaintiff should plead the time, place, content,

---

**20.** Plaintiff's allegations regarding violations of the Fair Credit Reporting Act were dealt with *supra* § V of this memorandum opinion.

**21.** The second allegation refers to the dissemination of an erroneous consumer report issued by

Equifax, Inc. For a more detailed explanation of the facts surrounding the dissemination of this report, see *Wiggins v. Equifax, Inc.*, 848 F.Supp. 213 (D.D.C.1993).

speaker, and listener of the alleged defamatory matter. *Id.*

■ The content of the alleged defamatory consumer report is not in dispute. The report stated that Mr. Wiggins had a felony cocaine conviction. This accusation of conviction of a crime is libelous *per se.* However, the allegations with respect to the other elements that must be plead with specificity are wholly insufficient.

Plaintiff's allegations with regards to the performance reports are entirely conclusory and are deficient to state a claim of defamation. *See* Compl. ¶ 26, 30, 38.

■ Even absent plaintiff's insufficient averments of defamation, plaintiff's defamation claim is also barred by the District of Columbia's one-year statute of limitations. D.C. Code § 12–301(4).[22] Plaintiff alleges that between 1988 and 1990, defendants published the allegedly defamatory remarks. This lawsuit was not filed until February 27, 1992, making these claims fall well beyond the one-year bar prescription.

Given the heightened pleading standard in defamation actions and the applicable statute of limitations, any claim by plaintiff averring defamation is dismissed.

### C. Wire Fraud and Mail Fraud

■ Plaintiff's federal wire and mail fraud claims must be dismissed because they are criminal offenses that have no corresponding private right of action. *See, e.g., Official Publications, Inc. v. Kable News Co.,* 884 F.2d 664, 667 (2d Cir.1989) ("18 U.S.C. §§ 1341 and 1343 ... do not provide a private right of action.").

### D. Section 1–2530 of the District of Columbia Code

Plaintiff's allegation of a violation of section 1–2530 of the District of Columbia Code by defendant Philip Morris is without merit.[23]

### E. Conspiracy under 42 U.S.C. § 1985(3)

■ In order to plead a viable cause of action under 42 U.S.C. § 1985(3),[24] plaintiff must allege (1) an act in furtherance of (2) a conspiracy (3) to deprive any person or class of persons of the equal protection of the

---

**22.** The text of D.C.Code § 12–301(4) is as follows:

> Except as otherwise specifically provided by law, actions for the following purposes may not be brought after the expiration of the period specified below from the time the right to maintain the action accrues:
>
> \* \* \* \* \* \*
>
> (4) for libel, slander, assault, mayhem, wounding, malicious prosecution, false arrest or false imprisonment—1 year....

D.C.Code Ann. § 12–301(4) (1989).

**23.** Section 1–2530 states:

> It shall be an unlawful practice, punishable by a fine of not more than $300, or imprisonment for not more than 10 days, or both, for any person to require the production of any arrest record or any copy, extract, or statement thereof, at the monetary expense of any individual to whom such record may relate. Such "arrest records" shall contain only listings of convictions and forfeitures of collateral that have occurred within 10 years of the time at which such record is requested.

D.C.Code Ann. § 1–2530 (1981).

**24.** 42 U.S.C. § 1985(3) states:

> If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of

depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitle to vote, form giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

42 U.S.C.A. § 1985(3) (1981).

laws, or of equal privileges and immunities under the laws. *Great American Fed. Savings & Loan Ass'n v. Novotny,* 442 U.S. 366, 372, 99 S.Ct. 2345, 2349, 60 L.Ed.2d 957 (1979). "Section 1985(3) provides no substantive rights itself; it merely provides a remedy for violation of the rights it designates." *Novotny,* 442 U.S. at 372, 99 S.Ct. at 2349. Therefore, this court must determine whether violations of the federal laws asserted in this case equate to a deprivation of " 'the equal protection of the laws, or of equal privileges and immunities under the laws' within the meaning of § 1985(3)." *Id.* There can be no recovery under section 1985(3) absent a violation of a substantive federal right.

### 1. 42 U.S.C. § 1981

First, plaintiff maintains that 42 U.S.C. § 1981 should be used as a basis for a cause of action under section 1985(3). This court has recognized that federal statutory rights such as those protected under section 1981 may provide a substantive basis for a section 1985(3) claim. *See Alder v. Columbia Historical Soc.,* 690 F.Supp. 9, 15 (D.D.C. 1988) (Bryant, J.); *Thompson v. International Assoc. of Machinists and Aerospace Workers,* 580 F.Supp. 662, 668 (D.D.C.1984) (Green, Joyce Hens, J.) ("[Section] 1981 is clearly a federal source of rights and unlike Title VII, '§ 1981 is not derived from a statutory scheme whose policies would be frustrated by the relitigation under another remedial statute.' " (quoting *Hudson v. Teamsters Local Union No. 957,* 536 F.Supp. 1138, 1147 (S.D. Ohio 1982)) (footnote omitted)). However, plaintiff fails to allege a violation of section 1981 by Philip Morris. *See supra*

§ III. Plaintiff also fails to allege the requisite elements of a conspiracy to violate section 1981. Thus, plaintiff's claim under section 1985(3) must fail.

### 2. Title VII

One claim surviving Philip Morris Inc.'s motion to dismiss is plaintiff's Title VII claim; however, the *Novotny* court found that Title VII cannot be the basis for a cause of action under section 1985(3). *Novotny,* 442 U.S. at 378, 99 S.Ct. at 2352; *Thompson,* 580 F.Supp. at 667 ("The Supreme Court has expressly removed the guarantees of Title VII from the category of 'designated rights' subject to redress under § 1985(3)....").

### 3. Fair Credit Reporting Act

Plaintiff also charges Philip Morris under section 1985(3) for a conspiracy to violate the Fair Credit Reporting Act. Although plaintiff asserts many violations under the Act, Philip Morris did not violate any of its duties as a potential user of consumer information under the FCRA. *See supra* § V. However, evidence does exist which could support a finding that Philip Morris participated in a racially motivated conspiracy with Equifax, Inc. and others to violate the FCRA. *See infra* § VI(F)(1).

Notwithstanding this evidence, and assuming, without deciding, that private conspiracies to violate subsequently enacted federal statutory law are actionable under section 1985(3), this court does not believe that the FCRA can be used as the basis for a cause of action under section 1985(3) without impairing the overall effectiveness of the FCRA.[25]

---

**25.** The *Novotny* Court left open the question of whether § 1985(3) redresses subsequently created statutory rights as well as constitutional deprivations. This court need not decide whether § 1985(3) forbids private conspiracies to deprive a person of the equal protection of subsequently created federal statutes; however, absent the *Novotny* analysis, this court concludes that it could dismiss the FCRA claim on this ground. *See Hobson v. Wilson,* 737 F.2d 1, 15 (D.C.Cir.1984) ("[T]he rights protected by section 1985(3) exist independently of the section and only to the extent that the *Constitution* creates them.").

The Second Circuit Court of Appeals dealt with this issue in detail in *Traggis v. St. Barbara's*

*Greek Orthodox Church,* 851 F.2d 584 (2d Cir. 1988). The Second Circuit stated, in part:

Less clear is the extent to which the statute remedies injuries resulting from private conspiracies to deprive persons or classes of persons of the equal protection of, or equal privileges and immunities under, federal statutory law or state law.... In *dictum,* the Court in *Novotny* appeared to suggest that private conspiracies to deprive persons of the equal protection of *state* law are not actionable under § 1985(3). Writing for the majority in *Novotny,* Justice Stewart stated that § 1985(3) "is a purely remedial statute, providing a civil cause of action when some otherwise defined *federal* right ... is breached by a conspiracy in the

In *Novotny*, the court reviewed several characteristics of Title VII in determining whether use of that statute as the predicate basis for a section 1985(3) claim would impair its overall effectiveness. Those characteristics included:

(1) "a detailed administrative and judicial process designed to provide an opportunity for nonjudicial and nonadversary resolution of claims," *id.* at 372–73, 99 S.Ct. at 2349;

(2) "time limitations for administrative and judicial filing are controlled by express provisions of the statute . . . [as] the statutory plans prevents immediate filing of judicial proceedings in order to encourage voluntary conciliation," *id.* at 373–74, 99 S.Ct. at 2350;

(3) "the EEOC['s] power to reinvestigate and prosecute a civil action in a complainant's case," *id.* at 374, 99 S.Ct. at 2350;

(4) and differing remedies under section 1985(3) and Title VII, such as provisions relating to injunctive relief, general or punitive damages, attorney's fees, and the right to a jury trial, *id.* at 374–75, 99 S.Ct. at 2350.

The Fair Credit Reporting Act does not possess all of these characteristics; however, the Act is sufficiently similar to Title VII to mandate that the Act should not be used as the underlying federal right in a section 1985(3) claim under the *Novotny* analysis.

With the enactment of the FCRA, Congress sought to create reasonable procedures regarding the dissemination and use of consumer information.[26] In attempting to achieve its goal, Congress emplaced a detailed statutory framework, setting levels of culpability and punishment and numerous

---

manner defined by the section." In a separate concurrence, Justice Powell, joined by Justice Stevens, stated that the reach of § 1985(3) "is limited to conspiracies to violate those fundamental rights derived from the Constitution." In another separate concurrence, Justice Stevens, joined by Justice Powell, wrote that "the Congress which enacted [§ 1985(3)] was concerned with providing federal remedies for the deprivations of rights protected by the Constitution and, in particular, the newly ratified Fourteenth Amendment." Thus, in Justice Stevens' view, § 1985(3) was not "intended to provide a remedy for the violation of statutory rights." . . . Finally, even the dissenting Justices in *Novotny* seemed to imply that § 1985(3) applies to federal rights only. (White, J., dissenting) ("the words 'equal privileges and immunities under the laws' in § 1985(3) refer to substantive rights created or guaranteed by other federal law, be it the Constitution or federal statutes other than § 1985(3)").

More recently, however, the Court has implied that § 1985(3) might, in fact, reach private conspiracies to violate [federal statutory] and state law. *Traggis*, 851 F.2d at 587–88. As the Court noted in *United Brotherhood of Carpenters & Joiners of America, Local 610 v. Scott*, 463 U.S. 825, 833, 103 S.Ct. 3352, 3359, 77 L.Ed.2d 1049 (1983):

[T]he Court of Appeals found it unnecessary to determine whether respondents' action could be sustained under § 1985(3) as involving a conspiracy to deprive respondents of rights, privileges, or immunities under state law or those protected against private action by the Federal Constitution or federal statutory law. Conceivably, we could remand for consideration of these possibilities, or we ourselves

could consider them. We take neither course. . . .

At the very least, this court believes that a subsequently created federal statute employed to evoke the remedies of § 1985(3) must have been enacted to vindicate rights protected by the constitutional notions of equal protection of the laws or equal privileges and immunities under the laws. The FCRA was enacted for no such purpose. *See* 15 U.S.C.A. § 1681(b) (1982) ("It is the purpose of this subchapter to require that consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information in accordance with the requirements of this subchapter.").

26. Although this court finds that the *Novotny* analysis precludes the FCRA from being employed in connection with § 1985(3), the court does not imply that the FCRA preempts all state-law claims regarding the dissemination of a consumer credit report. *See* 15 U.S.C.A. § 1681t (West 1985) ("This subchapter does not annul, alter, affect, or exempt any person subject to the provisions of this subchapter from complying with the laws of any State with respect to the collection, distribution, or use of any information on consumers, except to the extent that those laws are inconsistent with any provisions of this subchapter, and then only to the extent of the inconsistency."). As the *Novotny* court stated, "[t]he only question here, therefore, is whether the rights created by [the statute] may be asserted within the *remedial* framework of § 1985(3)." *Novotny*, 442 U.S. at 377, 99 S.Ct. at 2356.

procedural devices aimed at nonjudicial resolution of claims under the Act.

For example, the Act imposes different obligations upon consumer reporting agencies that provide consumer credit information and users of consumer reports. *Compare* 15 U.S.C.A. §§ 1681c–1681e (1982) *with id.* § 1681m. Users have a limited responsibility. Under the Act, the primary duty assigned to users of consumer information is mandatory disclosure to a consumer of the name and address of the consumer reporting agency that provided a report when the consumer is adversely affected by the dissemination of information provided for employment purposes. *See supra* § V. On the other hand, consumer reporting agencies were charged with several responsibilities. The Act requires consumer reporting agencies to maintain and follow a myriad of reasonable compliance and accuracy policies and to follow strict procedures in cases of disputed accuracy. If litigants were allowed to use section 1985(3) to compel users of consumer reports to comply with the duties imposed upon consumer reporting agencies via a federal conspiracy statute (and vice versa), then these litigants would be able to circumvent the intent of Congress and the purpose of the Act.[27]

The FCRA was also designed to provide for nonjudicial and nonadversarial resolution of claims. For instance, once a user of consumer information divulges the name and address of the consumer reporting agency that issued the consumer report upon which an adverse action was taken, section 1681i provides the procedures to be followed by the consumer as well as the consumer reporting agency in cases of disputed accuracy. Not all FCRA claims are subject to mandatory prejudicial process; however, the overall impact on the effectiveness of the statute would be impaired if these procedures could be skirted.

Furthermore, the express provisions of the FCRA set out varying levels of culpability and sanctions. Section 1681n provides for civil liability for willful noncompliance. This provision provides for actual damages, punitive damages, and costs and attorney's fees. Section 1681o provides for liability for negligent noncompliance. This section only provides for actual damages and costs and attorney's fees. Thus, the FCRA allows awards of punitive damages if tied to a level of culpable behavior. To allow a federal conspiracy theory under the FCRA would create a conflict between the Act's legislated remedial provisions and the accompanying body of interpretive law and the remedial provisions under 1985(3).[28]

Another characteristic shared by both Title VII and the FCRA is agency participation in enforcement of the statute. The FCRA provides for enforcement both by private damages actions and by the Federal Trade Commission. 15 U.S.C.A. § 1681s(a) (1982). The requirements imposed under the FCRA may be enforced under various other federal statutes such as the Federal Deposit Insurance Act, the Home Owners Loan Act, the Federal Credit Union Act, and the Federal Aviation Act when the users of the consumer reports are various agencies. *Id.* § 1681s(b).

It appears that Congress was meticulous in its enactment of the FCRA. The culpability, liability, remedy, and enforcement provisions demonstrate Congress's effort at creating a comprehensive statutory scheme. "If a violation of [the FCRA] could be asserted through § 1985(3), a complainant could avoid most if not all of these detailed and specific provisions of the law." *Novotny,* 442 U.S. at 375–76, 99 S.Ct. at 2351. "Unimpaired effec-

---

**27.** It is possible for a consumer reporting agency to scheme with a user of its financial information to further a conspiracy to violate one of the duties imposed upon the agency by the FCRA, and vice versa, *see infra* § VI(F)(1); however, this court believes that enabling the litigant to use § 1985(3) to create conspiracy liability would do more harm than good. Litigants may still pursue state conspiracy claims. *See id.;* 15 U.S.C.A. § 1681t (1982); *Wiggins v. District Ca-*

*blevision,* 853 F.Supp. 484, § V(A) (D.D.C.1994) (allowing state conspiracy theory causes of action for violations of the FCRA).

**28.** The complexity of the self-enforcement mechanisms are much more striking when contrasted with those of 42 U.S.C. § 1981. *See Thompson v. International Ass'n of Machinists,* 580 F.Supp. 662 (D.D.C.1984). Section 1981 does not have its own damages provisions.

tiveness can be given to the plan put together by Congress in [the FCRA] only by holding that deprivation of a right created by [the FCRA] cannot be the basis for a cause of action under § 1985(3)." *Id.* at 378, 99 S.Ct. at 2352.

Plaintiff's federal conspiracy claims are dismissed for failure to successfully plead an underlying, federally protected right required under section 1985(3).

### F. Civil Conspiracy

Plaintiff charges defendants with two alleged conspiracies. Plaintiff claims that defendants worked with Equifax in a conspiracy to tortiously interfere with plaintiff's contract and to violate the FCRA. Plaintiff's allegations as to defendants' acts in furtherance of the alleged conspiracies are numerous.

■ It is well established that "there is no recognized independent tort action for civil conspiracy in the District of Columbia," *Waldon v. Covington,* 415 A.2d 1070, 1074 n. 14 (D.C.1980); however, District of Columbia law "acknowledges the concept of civil conspiracy." *Halberstam v. Welch,* 705 F.2d 472, 479 (D.C.Cir.1983). "Since liability for civil conspiracy depends on performance of some underlying tortious act, the conspiracy is not independently actionable; rather it is a means for establishing vicarious liability for the underlying tort." *Id.*

■ Under District of Columbia law, the elements of a claim for civil conspiracy are "an agreement to do an unlawful act or a lawful act in an unlawful manner; an overt act in furtherance of the agreement by someone participating in it; and injury caused by the act." *Okusami v. Psychiatric Institute*

*of Washington, Inc.,* 959 F.2d 1062, 1066 (D.C.Cir.1992) (citing *Halberstam,* 705 F.2d at 487).[29] Moreover, "[t]o establish liability, the plaintiff also must prove that an unlawful overt act produced an injury and damages." *Id.* An agreement may be inferred from the underlying facts. *Id.*[30]

#### 1. Conspiracy to Violate the FCRA

Plaintiff asserts that defendants, nonparty Equifax Services, Inc., and others deliberately and willfully conspired to violate the FCRA.

"Plaintiff[ ] allege[s] that through Bruce Williams, [a District Cablevision employee,] Pettinelli and Hitchens, [and] both [their] employers conspired and worked together to terminate Plaintiff from [two] jobs ... and that both terminations occurred with the aid and assistance of Equifax Services, Inc." Compl. ¶ 49. Plaintiff argues that "[b]oth terminations were effected with the aid and assistance of Equifax Inc. by issuing the false drug conviction report in the District of Columbia, ... all of which occurred in violation of the Fair Credit Reporting Act, 15 USCA § 1681(a)(b) and (m) in using and reporting false information in a consumer report." *Id.* ¶ 50.

■ Although plaintiff cites inapplicable sections of the Fair Credit Reporting Act, he does put plaintiff on notice of his contention that Equifax, Inc. agreed with District Cablevision and Philip Morris to distribute a false consumer credit report regarding Mr. Wiggins in order to terminate Mr. Wiggins from his employment.

■ If evidence exists suggesting a conspiracy between a consumer reporting agency and a user of consumer information to

---

**29.** The exact language of *Halberstam* states the elements of a civil conspiracy as:
> (1) an agreement between two or more persons; (2) to participate in an unlawful act, or a lawful act in an unlawful manner; (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement; (4) which overt act was done pursuant to and in furtherance of the common scheme.

*Halberstam,* 705 F.2d at 477 (citation omitted).

**30.** "The element of agreement is a key distinguishing factor for a civil conspiracy action."

*Halberstam,* 705 F.2d at 477. Proof of a tacit understanding is sufficient to show agreement. As one court has stated: "[I]n most cases the court will have to infer a conspiracy from indirect evidence, it must initially look to see if the alleged joint tortfeasors are pursuing the same goal—although performing different functions—and are in contact with one another. The circumstances of each case dictate what other specific evidence may be useful in inferring agreement." *Id.* at 481.

violate one of the duties imposed under the Act, then either party can be held vicariously liable under a conspiracy theory of liability. Plaintiff has adequately alleged such a conspiracy in this case.

Plaintiff also has alleged facts that support at least an inference of an agreement to participate in a scheme to deliberately not correct the inaccurate consumer report, causing injury to Mr. Wiggins. *See also Wiggins v. District Cablevision*, 853 F.Supp. 484, § V(A) (D.D.C.1994).

### 2. Conspiracy to Tortiously Interfere with Employment Contract

 Plaintiff also alleges that defendants conspired together to tortiously interfere with plaintiff's employment. There is an underlying tort under D.C. law for tortiously interfering with an employment contract. Again, plaintiff has alleged facts that support at least an inference of an agreement to participate in a scheme to tortiously interfere with Mr. Wiggins' employment contract. *See supra* § VI(A).

Defendant's motion to dismiss with respect to count two is denied.

### VII. Conclusion

For the reasons set forth herein, defendant Philip Morris, Inc.'s motion to dismiss is denied with respect to count one of the complaint and granted with respect to counts three and four of the complaint. Count two is dismissed except for plaintiff's tortious interference with contract, conspiracy to violate the Fair Credit Reporting Act, and conspiracy to tortiously interfere with contract claims.

A separate order shall issue this date.

### ORDER

This case comes before the court on defendant Philip Morris, Inc.'s motion to dismiss. It is hereby ORDERED:

1. Plaintiff's motion for an enlargement of time, through and including April 15, 1992, within which to file his opposition to defendant Philip Morris' motion to dismiss is GRANTED *nunc pro tunc.*

2. Defendant Philip Morris, Inc.'s motion to dismiss the complaint for failure to state a claim upon which relief can be granted is DENIED with respect to count one of the complaint and GRANTED with respect to counts three and four in accordance with the accompanying memorandum opinion. Count two is DISMISSED as to defendant Philip Morris, Inc. except as to plaintiff's tortious interference with contract, civil conspiracy to violate the Fair Credit Reporting Act, and civil conspiracy to tortiously interfere with contract claims.

3. Defendant Philip Morris, Inc.'s motion to stay proceedings pending further developments in related actions is DENIED.

SO ORDERED.